IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

MICHAEL OXLEY,

      Plaintiff,

v.                       CASE NO. 2:10-cv-00213

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.

# M E M O R A N D U M   O P I N I O N

    This is an action seeking review of the decision of the Commissioner of Social Security denying Claimant's applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f.  Also pending before the court is Plaintiff's Motion to Remand on the Basis of New and Material Evidence.  Both parties have consented in writing to a decision by the United States Magistrate Judge.

    Plaintiff, Michael Wayne Oxley (hereinafter referred to as "Claimant"), protectively filed applications for SSI and DIB on July 14, 2006, alleging disability as of June 5, 2006, due to stomach problems, fluid on the heart and lungs, nodules on the liver, slipped disc in the back and mononucleosis. (Tr. at 243-45, 246-48, 278.)  The claims were denied initially and upon reconsideration.  (Tr. at 157-61, 162-66, 173-75, 176-78.)

Claimant requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 179.) The hearing was held on December 19, 2007, before the Honorable Theodore Burock. (Tr. at 24-58.) A supplemental hearing was held on January 23, 2009. (Tr. at 59-152.) By decision dated May 11, 2009, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 8-23.) The ALJ's decision became the final decision of the Commissioner on February 12, 2010, when the Appeals Council denied Claimant's request for review. (Tr. at 1-3.) On March 3, 2010, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

<u>Motion to Remand</u>

In considering Claimant's motion to remand, the court notes initially that the social security regulations allow two types of remand. Under the fourth sentence of 42 U.S.C. § 405(g), the court has the general power to affirm, modify or reverse the decision of the Commissioner, with or without remanding the cause for rehearing for further development of the evidence. 42 U.S.C. § 405(g); <u>Melkonyan v. Sullivan</u>, 501 U.S. 89, 97 (1991). Where there is new medical evidence, the court may remand under the sixth sentence of 42 U.S.C. § 405(g) based upon a finding that the new evidence is material and that good cause exists for the failure to previously offer the evidence. 42 U.S.C. § 405(g); <u>Melkonyan</u>, 501 U.S. at 97. The Supreme Court has explicitly stated that these are the only

2

kinds of remand permitted under the statute.  <u>Melkonyan</u>, 501 U.S. at 98.

In order to justify a remand to consider newly submitted medical evidence, the evidence must meet the requirements of 42 U.S.C. § 405(g) and <u>Borders v. Heckler</u>, 777 F.2d 954, 955 (4th Cir. 1985).[1]  In <u>Borders</u>, the Fourth Circuit held that newly discovered evidence may warrant a remand to the Commissioner if four prerequisites are met:  (1) the evidence is relevant to the determination of disability at the time the application was first filed and not simply cumulative; (2) the evidence is material to the extent that the Commissioner's decision "might reasonably have been different" had the new evidence been before him; (3) there is good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and (4) the claimant has

---

[1] Within relevant case law, there is some disagreement as to whether 42 U.S.C. § 405(g) or the opinion in <u>Borders</u> provides the proper test in this circuit for remand of cases involving new evidence.  This court will apply the standard set forth in <u>Borders</u> in accordance with the reasoning previously expressed in this district:

> The court in <u>Wilkins v. Secretary of Dep't of Health & Human Servs.</u>, 925 F.2d 769 (4th Cir. 1991), suggested that the more stringent <u>Borders</u> four-part inquiry is superseded by the standard in 42 U.S.C. 405(g).  The standard in § 405(g) allows for remand where "there is new evidence which is material and . . . there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."  However, <u>Borders</u> has not been expressly overruled.  Further, the Supreme Court of the United States has not suggested that <u>Borders</u>' construction of § 405(g) is incorrect.  Given the uncertainty as to the contours of the applicable test, the Court will apply the more stringent <u>Borders</u> inquiry.

<u>Brock v. Secretary, Health and Human Servs.</u>, 807 F. Supp. 1248, 1250 n.3 (S.D.W. Va. 1992) (citations omitted).

3

presented to the remanding court "at least a general showing of the nature" of the newly discovered evidence.  Id.

In support of Claimant's motion, he submits records from Dr. Jagannath dated February 15, 2009, thorough November 22, 2009 (Exhibit A), treatment notes from Dr. Murthy dated January 8, 2009, through March 17, 2009 (Exhibit B), records from Charleston Area Medical Center dated March 15, 2010 (Exhibit C), and records dated July 23, 2008, to November 17, 2008 (Exhibit D).  Claimant acknowledges that in fact, the Exhibit D records were contained in the administrative record before the ALJ.  (Pl.'s Reply, p. 7.)

The court finds that Claimant has not met the factors required for remand under sentence six.  Claimant provided the evidence which forms the basis of his motion, thereby meeting the final of the four elements with respect to Exhibits A, B and C.

However, Claimant does not show good cause for his failure to submit Exhibits A and B to the Commissioner.  Claimant asserts that the

> relevant cut off date in this case is 21 days after January 23, 2009, the date of the final hearing.  That was the date in which the ALJ kept the record open for the submission of new evidence. (Tr. 151).  "New" evidence relates to the nature of the evidence, not whether it existed at a certain time.  The issue of whether it could have been submitted or not during the relevant time period goes to the question of good cause.  Thus, there was good cause for not submitting the evidence as the record was closed on February 13, 2009, 21 days after January 23, 2009.

(Pl.'s Reply at 7.)

4

The ALJ's decision in this matter is dated May 11, 2009.  The decision of the Appeals Council is dated February 12, 2010. Claimant could have submitted the evidence contained in Exhibits A and B (which significantly predate the decision of the Appeals Council) to the Appeals Council pursuant to 20 C.F.R. §§ 404.970(b) and 416.1470(b) (2009), but did not.  Claimant's argument that the relevant time period for submitting the evidence ended on February 13, 2009, is not convincing or consistent with the above regulation.  Claimant simply does not offer a good reason as to why this evidence was not available to be submitted to the Commissioner.  As such, Claimant has not shown good cause for submitting the evidence contained in Exhibits A and B to the Commissioner.  Exhibit C, dated March 15, 2010, postdates the decision of the Appeals Council.  Though the court finds Claimant's argument cited above unconvincing, he could not have submitted this evidence to the Commissioner because it was not in existence until after the decision of the Appeals Council and, therefore, the court finds good cause as to Exhibit C.

Finally, there are only a handful of treatment notes in Exhibits A and B that relate to the relevant time period, the time prior to May 11, 2009, the date of the ALJ's decision: (1) treatment notes from Dr. Jagannath dated January 30, 2009, February 19, 2009, and April 23, 2009 and labs dated February 19, 2009 and April 24, 2009 (ECF No. 15-1, pp. 1-5) (Exhibit A); and (2)

treatment notes from Dr. Murthy dated January 8, 2008, February 30, 2008, September 11, 2008, March 17, 2009, May 12, 2009, and May 19, 2009.  (ECF No. 15-2, pp. 1-6) (Exhibit B).  The remainder of the notes postdate the ALJ's decision.  In particular, Exhibit C (March 15, 2010) postdates the ALJ's decision (May 11, 2009) by almost a year.

In any event, the treatment notes relating to the relevant time period are not material to the extent that the Commissioner's decision "might reasonably have been different" had the new evidence been before him.  The evidence generally indicates Claimant's ongoing symptoms, except that it reflects improvement in his blood pressure.  There is brief mention of dizziness, a new symptom, but no definitive diagnosis in the treatment notes.  Thus, Claimant has failed to show that the evidence contained in Exhibits A, B and C is relevant or material.

Claimant has not provided an adequate basis for the submission of new and material evidence such that remand is warranted pursuant to sentence six of 42 U.S.C. § 405(g).

<u>Review of the Commissioner's Decision</u>

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability.  <u>See</u> <u>Blalock v. Richardson</u>, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically

determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. §§ 404.1520, 416.920 (2009).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  Id. §§ 404.1520(a), 416.920(a).  The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.  Id. §§ 404.1520(b), 416.920(b).  If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment.  Id. §§ 404.1520(c), 416.920(c).  If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4.  Id. §§ 404.1520(d), 416.920(d).  If it does, the claimant is found disabled and awarded benefits.  Id.  If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work.  Id. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability.  Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).  The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform

other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2009). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. <u>McLamore v. Weinberger</u>, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he has not engaged in substantial gainful activity since the alleged onset date. (Tr. at 10.) Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of carpal tunnel syndrome, gastrointestinal impairment, back impairment and adjustment disorder with depressed mood. (Tr. at 10.) At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 13.) The ALJ then found that Claimant has a residual functional capacity for medium work, reduced by nonexertional limitations. (Tr. at 14.) As a result, Claimant cannot return to his past relevant work. (Tr. at 21.) Nevertheless, the ALJ concluded that Claimant could perform jobs such as security guard, rental clerk and counter clerk, which exist in significant numbers in the national economy.

8

(Tr. at 22.)  On this basis, benefits were denied.  (Tr. at 23.)

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence.  In Blalock v. Richardson, substantial evidence was defined as

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was forty-four years old at the time of the first administrative hearing. (Tr. at 28.) Claimant graduated from high

9

school.  (Tr. at 30.)  In the past, he worked as a pipe layer.
(Tr. at 55.)

The Medical Record

The court has reviewed all evidence of record, including the
medical evidence of record, and will summarize it briefly.

In 2004, Claimant fractured his left foot while working.  He
received a splint, crutches and pain medication and was discharged.
(Tr. at 355-56.)  Claimant had some mild swelling, but his fracture
healed and he had excellent mobility in his digits and tendons.
(Tr. at 360.)

Claimant was hospitalized from May 6-7, 2006, and was
diagnosed with ascending diverticulitis, etiology unknown.  He was
prescribed Cipro, Flagyl and IV fluids.  It was noted that Claimant
had a history of alcohol abuse.  (Tr. at 367.)  Claimant admitted
drinking six to eight beers a day after work.  (Tr. at 368.)
Claimant had a fatty liver with elevation of liver enzymes.  He was
advised to stop using alcohol.  (Tr. at 369.)  Claimant had a
history of pulmonary nodule in the right lower lobe and was advised
to follow up in three months with a CT scan of the chest.  (Tr. at
369.)  Claimant's blood pressure during this admission ranged from
116/56 (Tr. at 368) to 126/100 (Tr. at 373) and 126/101 (Tr. at
375).

Claimant was admitted to the hospital again from June 6-10,
2006, and diagnosed with abdominal pain, lung effusion, pericardial

10

effusion, elevated alkaline phosphatase and alcohol abuse.   (Tr. at 391.)  Claimant complained of severe lower abdominal pain, which had not stopped since his last admission.   Claimant reported vomiting with any solid food intake.   Claimant reported that he last drank four weeks ago when he was admitted the first time. Claimant tried to drink one day, but it made him sick.   (Tr. at 393.)  Claimant underwent a colonoscopy with polypectomy, which was otherwise normal.  An upper GI endoscopy was also normal.  (Tr. at 391, 396.)  An MRI of the lumbar spine without contrast showed no evidence of spinal stenosis or excess foraminal narrowing, but Claimant had a mild broad-based disk bulging at L5-S1, without compressive sequella.   An MRI of the thoracic spine without contrast showed left paracentral disc bulges at T5 and T6 with slight deflection of the cord at this level.  Claimant continued to improve and effusion of the lungs and pericardium remained stable. Abdominal tenderness improved, though Claimant remained slightly nauseated.  (Tr. at 392.)  Claimant's blood pressure ranged from 103/63 (Tr. at 394) to 105/63 (Tr. at 412).  (Tr. at 394.)

The record includes treatment notes and other evidence from Upper Kanawha Medical Center dated February 14, 2006, through July 27, 2006.  (Tr. at 460-71.)

On August 15, 2006, a State agency medical source completed a Physical Residual Functional Capacity Assessment and opined that Claimant could perform medium work, reduced by a need to avoid

concentrated exposure to fumes, odors, dusts, gases and poor ventilation. (Tr. at 472-79.)

On September 27, 2006, Louann Munday, APRN, BC-FNP, BC-ADM conducted a consultative psychological examination at the request of Claimant's then attorney. Claimant reported depression, insomnia, anxiety and panic attacks. Claimant had been seen at Terra Alta, but did not know why. After going over his history, it became obvious to Ms. Munday that it was for treatment of alcoholism. He attended a thirty-two day program four years ago. Claimant reported one DUI. His last alcohol use was the night before when he drank four to six beers. Ms. Munday diagnosed a mood disorder due to medical problems and alcohol dependence on Axis I and deferred an Axis II diagnosis. She rated Claimant's GAF at 69.[2] Ms. Munday offered medication for Claimant's alcohol use, but Claimant refused it initially. She prescribed Lexapro. She referred Claimant for counseling because he was an alcoholic and needed to stop drinking. (Tr. at 485.) The record includes a note dated October 18, 2006, indicating that Claimant reported by telephone that Lexapro was making him nauseous. (Tr. at 481.)

On November 2, 2006, an MRI of the liver showed fatty infiltration. (Tr. at 489.)

---

[2]  A GAF rating between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. (Text Revision) 2000).

On January 9, 2007, a State agency medical source completed a Physical Residual Functional Capacity Assessment and opined that Claimant could perform medium work, reduced by a need to avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation. (Tr. at 532-39.)

On February 8, 2007, Nina Shinaberry, M.A. examined Claimant at the request of the State disability determination service. Claimant reported past alcohol use, but that currently, he only consumed a beer "here and there." (Tr. at 542.) Ms. Shinaberry diagnosed adjustment disorder, chronic, with depressed mood secondary to physical illnesses on Axis I and made no Axis II diagnosis. She opined that Claimant

> does not appear to have any underlying psychological disorders other than an emotional reaction secondary to his physical illness and chronic pain which interferes with his daily activities and social functioning. Based upon the claimant's presentation and report, he most likely is experiencing depressed mood secondary to the loss of his employment due to his declining health.

(Tr. at 544.)

> Regarding Claimant's prognosis, Ms. Shinaberry wrote that

> at the recommendation of the Licensed Psychologist supervising and briefly seeing this case, this claimant is said [to] have poor prognosis. Mr. Oxley reported a consistent employment history and expressed a desire to return to work given he was free from pain and symptoms associated with his medical conditions. Mr. Oxley will most likely experience difficulty maintaining a full day's work secondary to his current physical condition. His current depressive symptomatology would also interfere with his ability to interact with others in an emotionally stable manner.

13

(Tr. at 544.)

On March 10, 2007, a State agency medical source completed a Psychiatric Review Technique form and opined that Claimant's severe mental impairments resulted in moderate difficulties in maintaining concentration, persistence and pace.  (Tr. at 545-58.)

The State agency source also completed a Mental Residual Functional Capacity Assessment on which she opined that Claimant was moderately limited in the ability to understand, remember and carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods and respond appropriately to changes in the work setting.  (Tr. at 559-61.)  The source wrote that "[a]s a result of his ongoing use of alcohol, the claimant would likely have the limitations identified above.  He retains the ability to learn and perform simple, unskilled, work-like activities in settings that do not require coping with high levels of stress." (Tr. at 561.)

The record includes treatment notes from Charleston Area Medical Center.  On October 9, 2006, Claimant complained of diarrhea and abdominal pain.  Claimant had decreased his drinking

14

over the past month.  Claimant was encouraged to attend Alcoholics Anonymous meetings.  (Tr. at 569.)  On November 14, 2006, Claimant reported that he drank eight beers on Halloween.  Claimant refused to go to AA meetings and had no interest in giving up alcohol. Claimant was encouraged to stop using alcohol.  (Tr. at 567.)

On April 16, 2007, Kris G. Murthy, M.D. conducted a consultative neurological examination related to Claimant's lower back pain.  Dr. Murthy diagnosed lumbar radiculopathic pain most likely secondary to degenerative joint disease versus midline disc disease, carpal tunnel syndrome, depression/anxiety, enlarged liver (?) and hypertension.  Claimant's blood pressure was 140/106.  Dr. Murthy recommended an MRI and a back brace and advised him not to lift heavy objects.  He also considered EMG studies.  (Tr. at 574.)

The record includes treatment notes from Dr. Murthy dated May 7, 2007, through September 18, 2007.  (Tr. at 576-85.)  Dr. Murthy noted low radiating back pain and abnormal liver function tests. He prescribed a TENS unit, which helped.   He noted chronic headaches, hypertension and anxiety/depression.

On December 4, 2007, Laberta S. Salamacha, M.A. conducted a consultative psychological examination at the request of Claimant's counsel.  She administered the WAIS-III, the WRAT-IV and the MMPI-II.  Claimant was taking Lexapro and Hydroxyzine.  (Tr. at 586.) Ms. Salamacha diagnosed major depressive disorder, recurrent, severe with psychotic features, chronic and panic disorder with

15

agoraphobia on Axis I and borderline intellectual functioning on Axis II.  Ms. Salamacha opined that Claimant was unable to work. (Tr. at 591.)  Ms. Salamacha completed an assessment on which she opined that Claimant was markedly to moderately limited in several areas.  (Tr. at 592-96.)

Claimant was hospitalized from June 22-23, 2007, with complaints of abdominal pain over the past four days, gradually worsening.  (Tr. at 601.)  His initial CT scan showed no acute inflammatory process and no bowel obstruction.  Claimant had borderline liver function tests.  Claimant had an esophagogastroduodenoscopy that showed hemorrhagic gastritis and duodenitis.  A colonoscopy showed no significant problem other than mild colitis.  (Tr. at 599, 627, 631.)  Claimant was discharged in stable, improved condition on a soft diet and given Lortab for pain.  (Tr. at 599-600.)

The record includes treatment notes from Bassam Haffar, M.D. dated June 19, 2007, July 23, 2007, and September 17, 2007.  (Tr. at 633-35.)

The record includes treatment notes from Dr. Murthy dated November 13, 2007, through June 17, 2008.  (Tr. at 637-42.) Claimant's blood pressure ranged from 242/130 (Tr. at 642), to 128/82 (Tr. at 639) and 110/78 (Tr. at 637).  Dr. Murthy treated Claimant for low back pain, depression and panic attacks, headaches and hypertension.

16

The record includes treatment notes from Dr. Jannath dated January 8, 2008, through September 4, 2008. (Tr. at 644-56.) Dr. Jannath treated Claimant for hypertension, Crohn's disease, low back syndrome, anxiety disorder, COPD and hyperlipidemia.

On July 23, 2008, Claimant underwent esophagogastroduodenoscopy with biopsies that showed esophagitis, gastritis and hiatal hernia. (Tr. at 688.)

Claimant underwent a colonoscopy on November 12, 2008, which showed mild diverticulosis, but was otherwise normal. (Tr. at 669.)

The record includes treatment notes from Dr. T. Jagannath dated September 4, 2008, through January 30, 2009. (Tr. at 702-07.)

The record includes treatment notes from Dr. Haffar dated January 14, 2008, through February 2, 2009. (Tr. at 709-21.)

The record includes Claimant's pharmacy records. (Tr. at 722-36.)

Regarding his consumption of alcohol, Claimant's girlfriend testified at the second administrative hearing (January 23, 2009) that Claimant had not had anything to drink since the last administrative hearing (December 19, 2007). (Tr. at 111.)

At the administrative hearing, Judith Brendemuehl, M.D. testified that Claimant had carpal tunnel syndrome, low back pain and gastrointestinal problems, including mild colitis, hemorrhagic

17

gastritis and ulcerative colitis. (Tr. at 87-90.)  Dr. Brendemuehl testified that these impairments do not meet or equal a listing. (Tr. at 98.)  She opined that Claimant could perform medium level work with occasional bilateral repetitive activity in the hands, an inability to climb ladders, ropes and scaffolds, occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching and crawling, and a need to avoid extreme temperatures, and concentrated exposure to vibration and all hazards and machines. (Tr. at 100.)

William Phelps, clinical psychologist, testified at the supplemental administrative hearing.  Mr. Phelps opined that Claimant's primary problem was overuse or misuse of alcohol. (Tr. at 129.)  Mr. Phelps opined that while Claimant no longer was drinking alcohol, by his testimony and that of his girlfriend, "I think the anxiety and any depression we see had been substance-induced from the total record." (Tr. at 136.)

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because (1) the ALJ committed reversible error by totally misconstruing and misrepresenting evidence to find Claimant not credible; (2) the ALJ did not properly apply 20 C.F.R. §§ 404.1520A and 416.920A; (3) the ALJ failed to consider Claimant's impairments in combination; and (4) the ALJ erred in his duty to develop the record. (Pl.'s Br. at 15-

18

41; Pl.'s Reply at 1-7.)

The Commissioner argues that (1) the ALJ properly evaluated the credibility of Claimant's subjective complaints; (2) the ALJ complied with 20 C.F.R. §§ 404.1520A and 416.920A; (3) the ALJ properly considered the combined effect of Claimant's mental impairments; and (4) the ALJ properly developed the record. (Def.'s Br. at 12-23.)

<u>Credibility</u>

The Claimant argues that the ALJ erred in finding Claimant not credible. Claimant contends that the ALJ erred in his findings about Claimant's daily activities. Claimant further asserts that the ALJ made conclusory findings about the location, duration, frequency and intensity of Claimant's pain and other symptoms. Claimant also argues that the ALJ took out of context, the testimony of Claimant and his girlfriend about the frequency of his vomiting and diarrhea and improperly found their testimony to be contrary to that of Dr. Brendemuehl. Claimant asserts that the ALJ erred in concluding that Claimant's high "F" score on the MMPI indicates Claimant is overreporting symptoms, ignoring other possible interpretations as testified to by Dr. Phelps. Claimant further argues that the ALJ ignored evidence of somatization. Claimant also asserts that the ALJ erred in findings related to Claimant's headaches. Claimant argues that the ALJ essentially ignored the precipitating and aggravating factors, the type,

19

dosage, effectiveness and side effects of medication categories and treatment other than medication. (Pl.'s Br. at 16-28.) Claimant asserts that his work record, the longitudinal medical record, internal consistency and consistency with other information in the record, activities of daily living, social activities, statements of psychologists, and hearing testimony, frequency of diarrhea and vomiting all support a finding that Claimant is credible. (Pl.'s Br. at 28-37.)

A two-step process is used to determine whether a claimant is disabled by pain. First, objective medical evidence must show the existence of a medical impairment that reasonably could be expected to produce the pain alleged. 20 C.F.R. §§ 404.1529(b) and 416.929(b) (2009); SSR 96-7p, 1996 WL 374186 (July 2, 1996); see also, Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996). If such an impairment is established, then the intensity and persistence of the pain and the extent to which it affects a claimant's ability to work must be evaluated. Craig, 76 F.3d at 595. When a claimant proves the existence of a medical condition that could cause pain, "the claimant's subjective complaints [of pain] must be considered by the Secretary, and these complaints may not be rejected merely because the severity of pain cannot be proved by objective medical evidence." Mickles v. Shalala, 29 F.3d 918, 919 (4th Cir. 1994). Objective medical evidence of pain should be gathered and considered, but the absence of such evidence is not determinative.

Hyatt v. Sullivan, 899 F.2d 329, 337 (4th Cir. 1990).  A claimant's
symptoms, including pain, are considered to diminish his capacity
to work to the extent that alleged functional limitations are
reasonably consistent with objective medical and other evidence.
20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4) (2009).
Additionally, the regulations provide that:

> [w]e will consider all of the evidence presented,
> including information about your prior work record, your
> statements about your symptoms, evidence submitted by
> your treating, examining, or consulting physician or
> psychologist, and observations by our employees and other
> persons. . . . Factors relevant to your symptoms, such
> as pain, which we will consider include:
>
> (i) Your daily activities;
>
> (ii) The location, duration, frequency, and
> intensity of your pain or other symptoms.
>
> (iii) Precipitating and aggravating factors;
>
> (iv) The type, dosage, effectiveness, and side
> effects of any medication you take or have taken to
> alleviate your pain or other symptoms;
>
> (v) Treatment, other than medication, you receive or
> have received for relief of your pain or other symptoms;
>
> (vi) Any measures you use or have used to relieve
> your pain or other symptoms (e.g., lying flat on your
> back, standing for 15 or 20 minutes every hour, sleeping
> on a board, etc.); and
>
> (vii) Other factors concerning your functional
> limitations and restrictions due to pain or other
> symptoms.

20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) (2009).

SSR 96-7p repeats the two-step regulatory provisions:

> First, the adjudicator must consider whether there

21

is an underlying medically determinable physical or
mental impairment(s)--i.e., an impairment(s) that can be
shown by medically acceptable clinical and laboratory
diagnostic techniques--that could reasonably be expected
to produce the individual's pain or other symptoms. * *
* If there is no medically determinable physical or
mental impairment(s), or if there is a medically
determinable physical or mental impairment(s) but the
impairment(s) could not reasonably be expected to produce
the individual's pain or other symptoms, the symptoms
cannot be found to affect the individual's ability to do
basic work activities.

Second, once an underlying physical or mental
impairment(s) that could reasonably be expected to
produce the individual's pain or other symptoms has been
shown, the adjudicator must evaluate the intensity,
persistence, and limiting effects of the individual's
symptoms to determine the extent to which the symptoms
limit the individual's ability to do basic work
activities. For this purpose, whenever the individual's
statements about the intensity, persistence, or
functionally limiting effects of pain or other symptoms
are not substantiated by objective medical evidence, the
adjudicator must make a finding on the credibility of the
individual's statements based on a consideration of the
entire case record.

SSR 96-7p, 1996 WL 374186, at *2. Significantly, SSR 96-7p

requires the adjudicator to engage in the credibility assessment as

early as step two in the sequential analysis; i.e., the ALJ must

consider the impact of the symptoms on a claimant's ability to

function along with the objective medical and other evidence in

determining whether the claimant's impairment is "severe" within

the meaning of the regulations. A "severe" impairment is one which

significantly limits the physical or mental ability to do basic

work activities. 20 C.F.R. §§ 404.1520(c) and 416.920(c).

Craig and SSR 96-7p provide that although an ALJ may look for

22

objective medical evidence of an underlying impairment capable of causing the type of pain alleged, the ALJ is not to reject a claimant's allegations solely because there is no objective medical evidence of the pain itself. <u>Craig</u>, 76 F.3d at 585, 594; SSR 96-7p, 1996 WL 374186, at *2 ("the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record"). For example, the allegations of a person who has a condition capable of causing pain may not be rejected simply because there is no evidence of "reduced joint motion, muscle spasms, deteriorating tissues [or] redness" to corroborate the extent of the pain. <u>Craig</u>, 76 F.3d at 595. Nevertheless, <u>Craig</u> does not prevent an ALJ from considering the lack of objective evidence of the pain or the lack of other corroborating evidence as factors in his decision. The only analysis which <u>Craig</u> prohibits is one in which the ALJ rejects allegations of pain <u>solely</u> because the pain itself is not supported by objective medical evidence.

The court has carefully considered the ALJ's pain (and other subjective symptoms) and credibility findings and finds that they are consistent with the applicable regulations, case law and social security ruling ("SSR") and are supported by substantial evidence. 20 C.F.R. §§ 404.1529(b) and 416.929(b) (2009); SSR 96-7p, 1996 WL 374186 (July 2, 1996); <u>Craig v. Chater</u>, 76 F.3d 585, 594 (4th Cir. 1996). The ALJ determined that Claimant had medically determinable

23

impairments that could be expected to cause the alleged symptoms. (Tr. at 16.) He proceeded to the second step in the pain analysis, and his decision contains a very thorough consideration of Claimant's daily activities, the location, duration, frequency, and intensity of Claimant's pain, precipitating and aggravating factors and Claimant's medication and treatment other than medication. (Tr. at 15-17.) The ALJ ultimately concluded that Claimant's subjective complaints of pain (and other symptoms) were not credible to the extent they exceeded those limitations found in his residual functional capacity finding, which limited Claimant to medium work with an ability to perform routine, repetitive tasks, an occasional ability to use the upper extremities, an inability to climb ladders, ropes or scaffolds, an occasional ability to climb ramps and stairs, balance, stoop, kneel, crouch, crawl and squat, a need to avoid concentrated exposure to extreme temperatures and vibration and a need to avoid all exposure to hazards. (Tr. at 14.)

The ALJ's findings about Claimant's daily activities are appropriate. The ALJ noted the testimony of Claimant and his girlfriend at both hearings. (Tr. at 15-16.) The ALJ found the testimony of Claimant's girlfriend to be not credible based on the testimony of Dr. Brendemuehl and the other evidence of record.

The court disagrees with Claimant's argument that the ALJ's findings are conclusory in nature related to the location,

24

duration, frequency and intensity of his pain and other symptoms. By way of example (the court's recitation is not exhaustive, as the ALJ's description was much more in depth), the ALJ noted that Claimant claims to have "constant pain, some days the pain is worse than other days.  He described the pain as aching and sometimes numbness that goes down into his leg."  (Tr. at 15.)  Claimant throws up "at least, four to five times a day, not including the dry heaves.  The claimant has diarrhea daily. *** The  claimant had carpal tunnel syndrome that causes him to drop things.   The claimant has headaches from time to time."  (Tr. at 15.)  This is but a sampling of the ALJ's findings in this regard, that continue onto page 16 of the transcript.  (Tr. at 16.)

Claimant takes issue with the ALJ's finding that Claimant did not provide convincing details regarding factors which precipitate the allegedly disabling symptoms, claiming that the symptoms are present constantly or all of the time.  Claimant refers to the ALJ's finding that

> [i]n regard to frequency, duration, and intensity of the claimant's alleged symptoms, he has not provided convincing details regarding factors which precipitate the allegedly disabling symptoms, claiming that the symptoms are present 'constantly' or all of the time. The claimant's allegations of vomiting and having diarrhea up to 20 times a day are not supported by the record. The claimant reported to Dr. Jagannath that he has only occasional diarrhea (Exhibit 24F).

(Tr. at 17.)  Claimant asserts that the ALJ's reasoning "is a paradigm of focusing on isolated statements or descriptions in

25

order to present a distorted and inaccurate picture of the evidence." (Pl.'s Br. at 17.)

Claimant cites to testimony from the Claimant about how frequently he had diarrhea and vomiting after he first got out of the hospital (up to 20 times a day) (Tr. at 85-86), and argues that the ALJ doctored the evidence "to produce the false impression that [Claimant] was claiming that such frequency was a common occurrence instead of occurring within a short period of time after [Claimant] left the hospital." (Pl.'s Br. at 19.)

Claimant also complains about the questioning of Dr. Brendemuehl, asserting that it too implied that Claimant claimed he had an ongoing problem with vomiting and diarrhea 10 to 20 times a day, when in fact, he testified to having vomiting and diarrhea much less frequently. (Pl.'s Br. at 19.)

The ALJ does not misrepresent or "doctor" the testimony of Claimant and his girlfriend about the frequency of his gastrointestinal complaints. The ALJ's findings about the Claimant's testimony related to the frequency of Claimant's diarrhea and vomiting are not limited to the statement cited above by Claimant. In his decision, the ALJ also finds:

* "The claimant stated that he has vomiting four to five times a day." (Tr. at 15, 48.)

* Claimant "stated he throws up, at least, four to five times a day, not including the dry heaves. The claimant has diarrhea

26

daily." (Tr. at 15, 48.)

* Claimant's girlfriend testified at the first administrative hearing that he "vomits about ten times a day; on a good day, he may only vomit four to five times. The claimant also has diarrhea." (Tr. at 15-16, 55.)

* "Claimant states he has bowel movements three to four times a day." (Tr. at 16, 66.)

* Claimant goes "to the bathroom three to four times a day for 10 to 15 minutes each time due to diarrhea." (Tr. at 16, 74-75.)

* Claimant stated that he "has vomited and diarrhea combined up to 20 times in one day." (Tr. at 16, 85-86.)

* Claimant's girlfriend testified at the supplemental hearing that Claimant has "constant diarrhea; he goes to the bathroom four to five times with diarrhea." (Tr. at 16, 106.)

The court has cited above, the corresponding pages in the transcript where Claimant and his girlfriend provided such testimony. As noted above, the ALJ provided a more extensive description of Claimant's and his girlfriend's testimony about the frequency of his diarrhea and vomiting than the one cited by the Claimant.

It is true that in rejecting Claimant's testimony about frequency, duration and intensity, the ALJ refers to "constant" symptoms and diarrhea and vomiting "up to 20 times a day ...." (Tr. at 17.) Also, the court has reviewed Dr. Brendemuehl's

testimony.  The court agrees that she was asked by the ALJ whether there were diagnostic or objective findings supporting vomiting and diarrhea 10 to 20 times daily.  (Tr. at 92.)  In response, Dr. Brendemuehl stated that with findings of colitis and hemorrhagic gastritis "it is not unusual to present with diarrhea rather profusely as a result of both of those problems.  And with treatment, that should get better."  (Tr. at 93.)  She further stated that such frequency was not currently in the record, that any weight loss was attributed to dieting and that there were no objective findings "to establish this" frequency as alleged.  (Tr. at 92-93.)

The court does not conclude that the ALJ erred in assessing the credibility of Claimant's symptoms related to diarrhea and vomiting and their frequency, duration and intensity.  The ALJ makes the more general statement in his decision that he "concludes Ms. Campbell's and the claimant's allegations of diarrhea and vomiting are not supported in the record."  (Tr. at 17.) Furthermore, the ALJ stated that "[a]t the supplemental hearing on January 23, 2009, Dr. Brendemuehl stated that there are no objective findings for the claimant's alleged diarrhea and vomiting."  (Tr. at 17.)  As noted above, this is an accurate statement as to diarrhea and vomiting 10 to 20 times per day on a regular basis.  However, what is more important is that Dr. Brendemuehl testified that the evidence of record supported a

28

finding that Claimant had severe physical impairments including carpal tunnel syndrome, low back impairment and a gastrointestinal impairment (mild colitis and gastritis), which did not equal a listing, but which resulted in an ability to perform medium work with an occasional use of the upper extremities, an inability to climb ladders, ropes and scaffolds, occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching and crawling, a need to avoid extremes in temperature and concentrated exposure to vibration and all hazards. (Tr. at 97-100.) Dr. Brendemuehl was present for the testimony of Claimant and his girlfriend, was aware of their testimony regarding diarrhea and vomiting and had considered the evidence of record related to Claimant's epigastric impairment when she opined regarding Claimant's severe impairments and resulting limitations.

Furthermore, in finding Claimant's testimony as to frequency not credible, the ALJ provides the following explanation:

> At the hearing on December 19, 2007, [Claimant] stated that his height is 5'11'' and his normal weight is 181 pounds; he alleged that he has had little appetite since 2006; and he is unable to hold anything down. The claimant has been prescribed Lonox to treat his diarrhea without improvement. The claimant stated he vomits four to five times a day. At the hearing on December 19, 2007, Ms. Campbell stated that the claimant throws up ten times a day; on a good day four to five times. At the supplemental hearing on January 23, 2009, the claimant stated he has diarrhea three to four times a day. He stated that he lost 30 pounds while he was in the hospital. The claimant testified he weighed 200 pounds before he got sick and lost 11 pounds; he currently weighs 189 pounds. At the supplemental hearing on January 23, 2009, Ms. Campbell stated the claimant has

diarrhea four to five times a day.  The record shows that
the claimant was losing weight because of dieting
(Exhibit 24F, page 7).  On June 19, 2007, Dr. Haffar
reported the claimant's weight at 197 pounds (Exhibit
22F).  On April 18, 2008, Dr. Haffar reported the
claimant's weight at 182 pounds (Exhibit 27F, page 4).
The record shows the claimant reported only occasional
diarrhea (Exhibit 24F, page 11).  At the supplemental
hearing on January 23, 2009, Dr. Brendemuehl stated that
there are no objective findings for the claimant's
alleged diarrhea and vomiting.  The undersigned concludes
Ms. Campbell's and the claimant's allegations of diarrhea
and vomiting are not supported in the record.

(Tr. at 17.)

The ALJ's conclusions are rational and supported by

substantial evidence.  In his reply, Claimant argues that weight

loss is not associated with chronic diarrhea and that Claimant's

weight history has little to do with his credibility as to

frequency.  Dr. Brendemuehl, the medical expert, did not think so,

as she pointed out that Claimant had not had any weight loss except

as attributed to diet.  (Tr. at 92.)  In turn, Claimant argues that

he was on a "diarrhea diet" in an attempt to correct his diarrhea,

not as a means of weight loss.  (Pl.'s Reply at 5 n.3.)  Again, the

ALJ's findings were based on Dr. Brendemuehl's opinion and, there

is no indication in the record that Claimant's weight loss was

attributable to this type of diet.

Among other factors cited by the ALJ, the objective medical

evidence of record contradicts the severity of Claimant's

allegations related to vomiting and diarrhea even if his symptoms

are assumed to be at their minimum, as the 2007 colonoscopy showed

only mild colitis (Tr. at 11, 599), Claimant was diagnosed with hemorrhagic gastritis, and the November 2008 colonoscopy was normal and showed only mild diverticulosis. (Tr. at 669-70.) Dr. Brendemuehl's testimony about Claimant's residual functional capacity and resulting limitations fully contemplate the limitations resulting from Claimant's severe gastrointestinal impairment. The factors identified above related to assessing subjective complaints were fully considered by the ALJ and his findings are supported by substantial evidence.

Finally, while Dr. Brendemuehl testified that she did not have the results of the latest colonoscopy (Tr. at 101), that testing was later added to the record and showed only mild diverticulitis (Tr. at 669). Thus, the record was not in need of further development, as Claimant suggests.

Claimant next argues that Claimant's physical problems contribute to his mental problems and vice versa. Claimant cites to medical evidence indicating that people with a somatic mental condition often have nausea and abdominal bloating and they may have vomiting and diarrhea, while individuals with "chronic erosive gastritis" (which Claimant does not have) may have nausea, vomiting and epigastric discomfort. Claimant takes issue with the ALJ's treatment of Dr. Phelps's testimony. Claimant asserts that Dr. Brendemuehl testified that Claimant has physical problems that result in vomiting and diarrhea that "can be" exacerbated by a

31

mental condition.  (Pl.'s Br. at  22, Tr. at 102.)  In turn,
Claimant asserts that Dr. Phelps testified that Claimant had some
tendency toward somatization and that his mental condition could
worsen his stomach problems.  (Pl.'s Br. at 22, Tr. at 27.)
Claimant argues that the ALJ repeatedly wanted Dr. Phelps to
attribute Claimant's high "F" score on the MMPI to over reporting
of his mental health symptoms and ignored the other possible
interpretations, including that a high "F" score can be a cry for
help. (Pl.'s Br. at 22-23.)  In a related vein, Claimant complains
that Dr. Phelps testified that the record was not complete because
another MMPI "'wouldn't be inappropriate.' (Tr. at 142)." (Pl.'s
Br. at 24 n.39.)

     The ALJ did not err as Claimant suggests.  First, Claimant was
never diagnosed with a somatoform disorder.  Dr. Phelps testified
that Claimant's elevated "F" scale on the MMPI showed "some
tendency toward somatization," but confirmed that "somatization ...
would be established if this were a valid test, along with clinic
examination." (Tr. at 126.)  Dr. Phelps questioned whether the
test was valid (Tr. at 126), and there was no evidence in the
record of a clinical examination diagnosing such a condition, not
even by Ms. Salamacha, who administered the MMPI.  Nevertheless,
the ALJ acknowledged Dr. Phelps's testimony about somatization and
the fact that it can result in vomiting and diarrhea and that
treatment of a somatoform disorder does not involve medication, and

32

instead requires counseling and continued cognitive therapy. (Tr. at 20.)   Moreover, Dr. Brendemuehl testified that Claimant's physical impairments, mild colitis, biopsy-proven gastritis, and hemorrhagic gastritis, caused vomiting and diarrhea (Tr. at 101), and the ALJ acknowledged and fully and carefully considered these symptoms in his decision (as noted above).   In short, whether these symptoms were caused by Claimant's established physical impairments or his suggested but undiagnosed mental impairment (somatoform disorder), his symptoms of diarrhea and vomiting were fully and adequately considered in his decision and the residual functional capacity as opined by Dr. Brendemuehl and accepted by the ALJ adequately reflected any limitations related to Claimant's gastrointestinal impairment.

Regarding the ALJ's duty to develop the record by ordering a second MMPI, the record related to Claimant's mental condition was adequate given the testimony of Dr. Phelps.   He confirmed that a somatoform disorder required clinical correlation, of which there was none.   The ALJ did not err in failing to develop the record further.   Claimant was represented by counsel and certainly could have obtained the examination himself if he wished.

Regarding Claimant's headaches, which the ALJ found to be nonsevere (Tr. at 12), Claimant argues that in considering Claimant's subjective complaints, the ALJ stated that Claimant testified to "having headaches two or three times a month lasting

33

two to three hours.  The record shows that the claimant reported having occasional headaches (Exhibit 24F)."  (Tr. at 17.)

The ALJ's finding is not in error.  In finding the condition not severe, the ALJ noted that at the supplemental hearing on January 23, 2009, Claimant testified that he had bad headaches two to three times a month that can last from two to three hours, and his doctor told him he had cluster headaches.  The ALJ further noted Dr. Brendemuehl's testimony at the same hearing indicating that Dr. Murthy's reports show nothing on migraines or cluster headaches, and that Claimant reported to Dr. Jagannath that he had only occasional headaches.  (Tr. at 12.)  The ALJ's finding in assessing Claimant's credibility is not inaccurate, particularly where Claimant is not claiming disability related to his headaches and does not dispute the finding that they are not severe.

Claimant asserts that the ALJ ignored the type, dosage and effectiveness of his medication and treatment other than medication.  (Pl.'s Br. at 26-27.)

Throughout his credibility analysis, the ALJ noted Claimant's use of a variety of medications, including Tramadol, three medications to treat his hypertension, Lexapro, Lonox, Cymbalta and Klonopin, among others.  (Tr. at 15-17, 20.)  The ALJ found that

> [d]espite the complaints of allegedly disabling symptoms, there have been significant periods of time since the alleged onset date during which the claimant has not taken any medications for those symptoms.  The claimant reported to Ms. Shinaberry that he stopped using Lexapro after only two days (Exhibit 11F).  On February 8, 2007,

the claimant reported that he was not currently using any
medications (Exhibit 11F).

(Tr. at 17.)

While the ALJ's consideration of Claimant's medication is not
contained in a complete and discrete paragraph, it is important to
note that Claimant testified at the supplemental administrative
hearing that he had no side effects from the medication he was
taking. (Tr. at 77.) Furthermore, regarding other treatments,
contrary to Claimant's assertions, the ALJ did consider Claimant's
use of a back brace and TENS unit in his decision. (Tr. at 15.)

Claimant cites a number of other factors that he argues
support his credibility. The court has carefully considered those
arguments, but finds them unconvincing. The ALJ's pain (and other
subjective symptoms) and credibility analysis, while not perfect,
is supported by substantial evidence.

Mental Impairments

Next, Claimant argues that the ALJ erred in failing to
properly apply 20 C.F.R. § 1520A. Claimant takes issue with
Claimant's findings that Claimant had mild restrictions in
activities of daily living and mild difficulties in social
functioning. (Pl.'s Br. at 38-39.)

When evaluating a claimant's mental impairments, the Social
Security Administration uses a special sequential analysis outlined
at 20 C.F.R. §§ 404.1520a and 416.920a (2009). First, symptoms,
signs, and laboratory findings are evaluated to determine whether

35

a claimant has a medically determinable mental impairment. §§ 404.1520a(b)(1) and 416.920a(b)(1). Second, if the ALJ determines that an impairment(s) exists, the ALJ must specify in his/her decision the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s). §§ 404.1520a(b)(1) and (e), 416.920a(b)(1) and (e). Third, the ALJ then must rate the degree of functional limitation resulting from the impairment(s). §§ 404.1520a(b)(2) and 416.920a(b)(2). Functional limitation is rated with respect to four broad areas (activities of daily living, social functioning, concentration, persistence or pace, and episodes of decompensation). §§ 404.1520a(c)(3) and 416.920a(c)(3). The first three areas are rated on a five-point scale: None, mild, moderate, marked, and extreme. The fourth area is rated on a four-point scale: None, one or two, three, four or more. §§ 404.1520a(c)(4) and 416.920a(c)(4). A rating of "none" or "mild" in the first three areas, and a rating of "none" in the fourth area will generally lead to a conclusion that the mental impairment is not "severe," unless the evidence indicates otherwise. §§ 404.1520a(d)(1) and 416.920a(d)(1). Fourth, if a mental impairment is "severe," the ALJ will determine if it meets or is equivalent in severity to a mental disorder listed in Appendix 1. §§ 404.1520a(d)(2) and 416.920a(d)(2). Fifth, if a mental impairment is "severe" but does not meet the criteria in the Listings, the ALJ will assess the claimant's residual functional

36

capacity.   §§  404.1520a(d)(3)  and  416.920a(d)(3).   The  ALJ
incorporates  the  findings  derived  from  the  analysis  in  the  ALJ's
decision:

> The decision must show the significant history, including
> examination and laboratory findings, and the functional
> limitations that were considered in reaching a conclusion
> about  the  severity  of  the  mental  impairment(s).   The
> decision must include a specific finding as to the degree
> of limitation in each of the functional areas described
> in paragraph (c) of this section.

§§ 404.1520a(e)(2) and 416.920a(e)(2).

     The  court  finds  that  the  ALJ  adequately  complied  with  the
applicable  regulations  cited  above,  and  his  findings  are  supported
by  substantial  evidence.   The  ALJ  found  that  Claimant  had  a  severe
adjustment  disorder  with  depressed  mood.   (Tr.  at  10.)   In
evaluating  the  "B"  criteria,  he  found  that  Claimant  had  mild
restriction  in  activities  of  daily  living,  mild  difficulties  in
social  functioning,  moderate  difficulties  in  concentration,
persistence  and  pace  and  no  episodes  of  decompensation,  each  of
extended  duration.   (Tr.  at  13-14.)   The  ALJ  determined  that
Claimant's  mental  impairment  did  not  meet  the  listings,  but  that
Claimant's  residual  functional  capacity  was  limited  from  a  mental
standpoint  to  routine,  repetitive  tasks.   (Tr.  at  13-14.)

     The  ALJ  found  that  Claimant's  reported  daily  activities  on
July  25,  2006,  included  watching  television,  taking  care  of
personal  hygiene,  and  talking  on  the  telephone.   On  the  Function
Report  dated  December  8,  2006,  Claimant  reported  that  his  daily

37

activities include watching television, looking out the window, taking care of personal hygiene and looking at books. On February 8, 2007, Claimant reported that his daily activities include looking at magazines, watching television, watching out the window, and taking care of personal hygiene. (Tr. at 14.)

Regarding social functioning, the ALJ found that Claimant had mild difficulties. He noted that at the hearing on December 19, 2007, Claimant stated that he lives with his girlfriend and his son and on February 8, 2007, Ms. Shinaberry noted that the Claimant was polite and cooperative during her evaluation. (Tr. at 14.)

Claimant complains that "[n]one of the above activities require[s] any exertion" and that his activities of daily living were more restricted than the ALJ's summary discloses. (Pl.'s Br. at 38.) In addition, according to Claimant, the record as a whole shows that Claimant had serious limitations in social functioning. (Pl.'s Br. at 38.)

The ALJ's findings are supported by substantial evidence. In addition to the evidence cited by the ALJ, the findings are consistent with the opinion of the State agency medical source who reviewed the medical evidence of record related to Claimant's mental condition. (Tr. at 555, 560.) While Claimant may disagree with the ALJ's findings and while there may be evidence to the contrary, there is substantial evidence of record supporting the ALJ's findings related to activities of daily living and social

functioning.

<u>Combination</u>

Claimant argues that the ALJ failed to evaluate Claimant's impairments in combination.  Claimant asserts that the ALJ never "actually discuss[es] or analyz[es] combination."  (Pl.'s Br. at 39-40.)  Claimant asserts that there is unrebutted evidence that Claimant's anxiety and somatization contributed to the frequency and severity of his diarrhea and vomiting.  (Pl.'s Br. at 41.)

The social security regulations provide,

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.

20 C.F.R. §§ 404.1523, 416.923 (2009).  Where there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's ability to engage in substantial gainful activity."  <u>Oppenheim v. Finch</u>, 495 F.2d 396, 398 (4th Cir. 1974).  The ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity.  <u>Id.</u>  The cumulative or synergistic effect that the various impairments have on claimant's ability to work must be analyzed.  <u>DeLoatche v. Heckler</u>, 715 F.2d 148, 150 (4th Cir. 1983).

39

The ALJ adequately considered Claimant's impairments both alone and in combination.  This is evidenced throughout the ALJ's decision, in the residual functional capacity finding and in questioning of the vocational expert.  As noted above, Claimant was never diagnosed with a somatoform disorder, but the ALJ did acknowledge and consider Dr. Phelps's testimony that "a somatoform disorder can result in vomiting and diarrhea; treatment of somatoform is no medication just counseling and continued cognitive therapy. [Dr.] Phelps noted that the claimant's treating doctor is prescribing strong medications for pain as well as mental health. *** [Dr.] Phelps stated that the primary psychological problem has been over-use or misuse of alcohol."  (Tr. at 20.)  The ALJ afforded some weight to Dr. Phelps's opinion.  The ALJ adequately considered Claimant's impairments both alone and in combination.

Duty to Develop

Finally, Claimant argues that because both medical experts testified that additional evidence was needed, he committed reversible error by failing to further develop the record.  (Pl.'s Br. at 41 n.43.)

The court has addressed these arguments above.  In Cook v. Heckler, the Fourth Circuit noted that an ALJ has a "responsibility to help develop the evidence."  Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986).  The court stated that "[t]his circuit has held that the ALJ has a duty to explore all relevant facts and

40

inquire into the issues necessary for adequate development of the record, and cannot rely on evidence submitted by the claimant when that evidence is inadequate." Id. The evidence in this matter was not inadequate.

After a careful consideration of the evidence of record, the court finds that the Commissioner's decision is supported by substantial evidence. Accordingly, by Judgment Order entered this day, the Plaintiff's Motion to Remand is DENIED, the final decision of the Commissioner is AFFIRMED and this matter is DISMISSED from the docket of this court.

The Clerk of this court is directed to transmit copies of this Order to all counsel of record.

ENTER: August 29, 2011

_Mary E. Stanley_
Mary E. Stanley
United States Magistrate Judge

41